Kyle Singhal (D.C. Bar No. 1601108)
*admitted pro hac vice*
Hopwood & Singhal PLLC
1701 Pennsylvania Avenue N.W., Ste. 200
Washington, DC 20006
Tel.: (817) 212-9041
kyle@hopwoodsinghal.com
*Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Paul Guertin, | § | |
| | § | No. _____ |
| Plaintiff, | § | |
| | § | **COMPLAINT** |
| v. | § | |
| | § | |
| United States of America, | § | |
| | § | |
| Defendant. | § | |

Comes now Plaintiff, Paul Guertin ("Mr. Guertin"), by and through his undersigned counsel, and files this Complaint, and in support thereof states as follows:

## I.    Preliminary Statement

1.     This civil-rights action seeks justice for Mr. Guertin, an American Foreign Service Officer who was wrongfully, corruptly, and maliciously prosecuted by Special Agent Robin Leipfert ("Agent Leipfert"), and who was ultimately exonerated by the United States District Court for the District of Columbia and the D.C. Circuit Court of Appeals. Mr. Guertin seeks justice for Agent Leipfert's tortious and unconstitutional behavior that included repeatedly and deliberately perjuring herself in search-warrant affidavits and lying to a grand jury in order to assail him with fraudulent allegations of criminal conduct, derail his career, and disgrace him publicly. To that end, Mr. Guertin seeks to hold

1

Defendant United States of America (the "United States") liable for the tortious misconduct of Agent Leipfert and other federal employees who neglected to supervise Agent Leipfert's botched investigation and prosecution of Mr. Guertin. But for that negligent supervision, Agent Leipfert would not have been able to bring the false charges of fraud and obstruction against Mr. Guertin that he had to spend more than six years fighting in order to vindicate his innocence and preserve his freedom.

## II.    Parties

2.      Mr. Guertin is an adult American citizen and is domiciled in the State of Arizona.

3.      The United States was Agent Leipfert's employer at all times relevant to this action. Agent Leipfert was, at all times relevant to this action, a Special Agent with the Office of Inspector General ("OIG") for the United States Department of State ("State Department").

## III.    Jurisdiction and Venue

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1), because this case arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq*.

5.      This Court has jurisdiction over the United States by virtue of the United States' waiver of sovereign immunity in 28 U.S.C. § 1346(b)(1) because this is an action (1) against the United States (2) for money damages (3) for Mr. Guertin's loss of property and other damages (4) caused by the negligent or wrongful acts and omissions of Agent Leipfert and other employees of the United States (5) while those persons acted within the scope of their office or employment (6) under circumstances where the United States, if a private person, would be liable to Mr. Guertin under District of Columbia tort law.

2

6.     No exception to the United States' waiver of sovereign immunity in 28 U.S.C. § 1346(b)(1), whether listed in 28 U.S.C. § 2680 or otherwise, applies in this case.

7.     Venue is proper in this District under 28 U.S.C. § 1402(b) because Mr. Guertin resides in this District. Mr. Guertin has been a full-time resident of Arizona for almost six years, since early 2018.

## IV.    Statement of Facts

8.     Prior to Agent Leipfert's interposition, Mr. Guertin's career was a paragon of the American dream. Born and raised in Rhode Island, Mr. Guertin earned his undergraduate degree in political science from Loyola University in Baltimore in 2002 and his MBA from Clark University in Worcester, Massachusetts, in 2004. He then worked as a project analyst for Fidelity Investments before beginning his diplomatic career at the State Department in 2007, where he was employed as a Foreign Service Officer for over ten years, earning outstanding reviews each and every year.

### *Mr. Guertin's Career at the State Department*

9.     After completing Mandarin Chinese language training, Mr. Guertin first served as a Consular Officer in Shanghai from January 2008 through February 2010, conducting visa interviews and adjudicating more than 40,000 non-immigrant visas (sometimes over one hundred per day), among other tasks.

10.     Following his first year of consular work in Shanghai, Mr. Guertin's direct supervisor commended his performance in Mr. Guertin's annual Employee Evaluation Report ("EER"), saying: "In his first year, Paul Guertin has led by example, setting a high standard that all new officers should aspire to achieve. Eager to learn as much as possible, Paul volunteers at every opportunity and consistently exceeds expectations in the performance of his work. Perhaps most impressive of his many accomplishments, Paul has

earned and maintained sincere respect among ALL Consulate employees in Shanghai. In a high-volume, high-stress consular operation, Paul exemplifies a high dedication to service, teamwork, and the vital skills of adaptability to change and balancing competing interests. As one of the section's most productive adjudicators of non-immigrant visa ('NIV') applications, Paul is also the most thorough with his attention to relevant details and timely decision-making. In my daily reviews of his adjudications, Paul makes reasoned and effective decisions based on U.S. law. He also maintains a naturally courteous interview demeanor that leaves applicants, even those denied visas, with only positive impressions of the United States. This is additionally evidenced by the fact that the Consulate has never received any complaints from applicants whom Paul has interviewed."

11.     After completing his tour in Shanghai, Mr. Guertin worked as an Economic Officer at the U.S. Embassy in Islamabad, Pakistan, from May 2010 through June 2011, where his supervisors again raved about his performance, writing, "Though only a second tour officer in his first reporting role, Paul exhibits the intellectual and analytical abilities, and the drafting and communication skills of a much more experienced officer. He is innovative, motivated, and genuinely gets a thrill out of taking on the tough assignments. Paul has not exceeded expectations; he has redefined them. Paul should be tenured and promoted immediately. Paul is the strongest drafter in the section. He is able to synthesize complicated economic concepts and data and present them in meaningful, concise cables and emails. Moreover, his analysis of issues often uncovered other problems with Pakistan's economic policies. For instance, when conducting meetings to report on the status of a Government of Pakistan handout to employees of state-owned firms, Paul discovered that nearly 70% of the $1.35 billion would be directed to employees of one company in a process rife with opportunities for corruption. Paul's cable highlighting this

previously unreported issue won mention in an official 'kudos' cable from the Special Representative for Afghanistan and Pakistan."

12.     Following his assignment in Islamabad, Mr. Guertin worked as a Special Assistant in the Bureau of Intelligence and Research ("INR") in Washington, D.C., from July 2011 through July 2012. Mr. Guertin supported INR's Assistant Secretary and worked to advance the bureau's mission to provide independent intelligence analysis to senior State Department policymakers, helping to ensure that U.S. intelligence activities supported foreign policy and national security interests.

13.     As with every single one of his prior and subsequent annual EERs, Mr. Guertin's 2012 EER, which was drafted by Ambassadors Philip Goldberg and John Dinger, and which focused on his work at INR, was outstanding. This EER stated, for instance, that Mr. Guertin "is one of the most reliable and organized people I've supervised" and that he is "remarkably responsive," he "relentlessly pursues quality," and "[h]is attention to detail is phenomenal," while also highlighting Mr. Guertin's "discretion and good judgment" in safeguarding all classified material. The EER "strongly recommend[ed] that [Mr. Guertin] be immediately promoted" and predicted that Mr. Guertin's "complete package of smarts, competence, reliability, judgment, and a winning personality" would "carry him far into the senior ranks of the Foreign Service." For the next five years, that prediction appeared to bear out in Mr. Guertin's career progression.

14.     After his year at INR, Mr. Guertin served as Indonesia Desk Officer for the Bureau of East Asian and Pacific Affairs in Washington, D.C., from August 2012 through August 2014. There, Mr. Guertin's supervisors noted, "Paul Guertin delivered an outstanding performance as Indonesia Desk Officer, working long hours to successfully manage a consistently huge volume of fascinating but unpredictable issues. Paul helped

manage the Secretary's participation in the APEC Summit and the massive interagency Ministerial-level Joint Commission Meeting, steered the U.S. economic and environmental relationship with Indonesia, helped prepare our new U.S. Ambassador to Indonesia through the consultation and confirmation process, and provided excellent customer service to the EAP front office and Embassy Jakarta. Paul is a huge asset to this office. He is smart and perceptive. He has a complete professional skillset and a wonderful sense of humor that inspires everyone in the office to work hard and have fun. Paul should be promoted as soon as he is eligible."

15.     Finally, after completing an intensive 88-week Mandarin Chinese training course in Washington, D.C., and Taipei, Taiwan, Mr. Guertin served as Political Unit Chief at the U.S. Consulate General in Chengdu, China, from July 2016 through July 2017. There, the U.S. Consul General wrote, "Paul is a reporting dynamo and a polished control officer. His success as acting section chief for extended periods further reinforces my confidence that he is fully ready to be promoted and given greater responsibilities right now. Paul's groundbreaking reporting on Tibet and human rights issues is even more impressive when put in the context of China's efforts to isolate foreign diplomats and journalists from disaffected elements of society. Paul's dogged pursuit of the facts, and willingness to travel to the roughest, most remote parts of the Tibetan Plateau, have given us an unprecedented understanding of the social stability issues that keep Chinese leaders up at night. Paul richly deserves the frequent praise his cables receive from readers in Beijing and DC. Paul was equally effective in supporting some of our most important visits. He received similarly positive feedback for his work as deputy control officer for a visit last month by a large and influential Congressional delegation to Lhasa, Tibet. Senator Rob Portman (R-OH) sent a note of personal thanks to Paul, commenting that his 'subject matter expertise and

logistical and language support was extremely useful and helped make the trip more effective and worthwhile.'"

16.     During his tenure, Mr. Guertin received the Meritorious Honor Award— bestowed in recognition of a special act or service or sustained outstanding performance— not once but *three* times. His final EER, submitted on May 11, 2017, again stated that "he is fully ready to be promoted and given greater responsibilities." Throughout his career at the State Department, Mr. Guertin did not have a single security infraction: his annual performance reviews often noted that he took extreme care to protect classified information, with the result that he never once shared any classified information with any individual that lacked the right to know about it.

17.     In short, Mr. Guertin played a crucial role in the execution of American foreign policy for over a decade, discharging his duties with aplomb at every turn.

### *Mr. Guertin's Security Clearance*

18.     As a condition of joining the State Department as a Foreign Service Officer, Mr. Guertin applied for and maintained a Top Secret security clearance. This process included completing a background investigation questionnaire on Standard Form 86 ("SF-86"). Mr. Guertin completed his first SF-86 on September 27, 2005 (prior to joining the State Department). He submitted subsequent SF-86s on November 19, 2010, and April 3, 2016, as was required to maintain his clearance.

19.     The SF-86 is a lengthy questionnaire that requires an applicant to disclose background information about both the applicant and the applicant's contacts (such as people the applicant knows well, relatives, and foreign contacts). Specifically, with respect to foreign contacts, the SF-86 requires an applicant to disclose the name of (and certain other details pertaining to) any foreign national with whom the applicant has had close or

continuing contact within the preceding seven years and with whom the applicant or the applicant's spouse or cohabitant is bound by affection, influence, common interests, or obligation.

20.     In his 2016 SF-86, consistent with these disclosure obligations, Mr. Guertin truthfully disclosed that his foreign contacts included a "professional or business" relationship with two Chinese nationals (the "Tenants") who rented a bedroom in his house in Washington, D.C. while attending graduate school at George Washington University and who assisted him with maintaining his property while he was stationed overseas. Over the course of the seven years that Mr. Guertin owned this property, he rented out bedrooms to a variety of tenants, most of whom were U.S. citizens. Mr. Guertin likewise also disclosed other foreign nationals as close contacts on his SF-86, including several former classmates from graduate school that he remained in contact with. The Tenants reciprocated this disclosure, listing Mr. Guertin as their primary contact in the United States on both of their visa application forms and providing the address of his home in D.C. as their intended residence upon arrival.

21.     The SF-86 also requires an applicant to disclose such other information as psychological and emotional conditions, drug and alcohol use, criminal conduct, and financial records. One of the financial-records questions asked whether Mr. Guertin had ever experienced financial problems due to gambling. Mr. Guertin truthfully answered, "no." Mr. Guertin completed the entirety of SF-86 truthfully, and he submitted it online on April 3, 2016, while on assignment in Taipei, Taiwan.

22.     On May 31, 2016, while still in Taiwan, Mr. Guertin spoke with a contract background investigator concerning his 2016 SF-86 and truthfully answered all questions asked, including detailed questions about the Tenants.

23.     In June 2017, while serving in Chengdu, China, Mr. Guertin was told that his security clearance had been suspended on an interim basis, pending the results of an investigation. He requested to meet with investigators from the Bureau of Diplomatic Security but was told that such a meeting was premature. In the interim, Mr. Guertin was offered a non-sensitive position with the State Department's Freedom of Information Act office for the duration of the investigation. It was not until after his 2021 indictment that Mr. Guertin learned that Agent Leipfert had directly requested the suspension of his security clearance in 2017.

24.     In August 2017, Mr. Guertin resigned from the State Department. At the time of his resignation, Mr. Guertin did not know the facts (set forth below) about Agent Leipfert's investigation into his background.

### *Agent Leipfert's "Investigation" of Mr. Guertin*

25.     In January 2016, Agent Leipfert began working as a Special Agent with State Department OIG.

26.     State Department OIG had, prior to the commencement of Agent Leipfert's employment there, received a tip from the FBI purportedly stating that Mr. Guertin had engaged in overseas transactions related to online gambling and to non-gambling sports competitions on websites such as Fanduel.com. The tip included an analysis by a Department of Justice ("DOJ") attorney expressly noting for OIG that the relevant gambling statute applied only to persons "engaged *in the business* of betting or wagering," citing 18 U.S.C. § 1084 (the "Federal Wire Act") and specifically highlighting the words "*in the business.*" As a result of this tip, there was an OIG case open concerning Mr. Guertin.

27.     Mr. Guertin has never been in the business of betting or wagering.

28.     On February 3, 2016, Agent Leipfert was assigned to Mr. Guertin's case. On information and belief, within months thereafter, Agent Leipfert assumed unsupervised responsibility for investigating Mr. Guertin's conduct as a Foreign Service Officer.

29.     Alternatively, Agent Leipfert worked under the supervision of one or more Special Agents in Charge, Assistant Special Agents in Charge, or other federal employees who failed to exercise reasonable care in supervising Agent Leipfert's investigation of Mr. Guertin.

30.     The United States had a duty to exercise reasonable care in the supervision of Agent Leipfert's investigation.

31.     The employees of the United States under whom Agent Leipfert worked had a duty to exercise reasonable care in the supervision of Agent Leipfert's investigation. On information and belief, those employees included State Department OIG Special Agent in Charge Tamara Yoder ("Agent Yoder") and Assistant Special Agent in Charge Zachary Baumgart ("Agent Baumgart"), among others.

32.     Agent Yoder, Agent Baumgart, and any other federal employees who supervised Agent Leipfert's investigation breached their duty of reasonable care by negligently supervising (or failing to supervise) the investigation, permitting Agent Leipfert to engage in the conduct set forth below.

33.     Starting on March 11, 2016, Assistant United States Attorney Christopher Brown ("AUSA Brown") issued subpoenas for all of Mr. Guertin's financial and tax records from 2011 through 2016. On April 19, 2016, AUSA Brown submitted a sealed *ex parte* application for an order, pursuant to 18 U.S.C. § 2703(d), for Google to release non-content metadata from Mr. Guertin's Google accounts, including his Gmail. A magistrate

judge granted the order. Mr. Guertin does not know the extent to which Agent Leipfert was involved in AUSA Brown's activities discussed in this paragraph.

34. On May 3, 2016, Special Agents Katharine Kovacek and Benjamin Brockschmidt, also with State Department OIG, went to the Washington, D.C., home of Mr. Guertin, while Mr. Guertin was stationed in Taipei. Agents Kovacek and Brockschmidt collected trash that had been set out for collection and then transported the trash to another location for further investigation. The purpose of this trash search was to verify the accuracy of Mr. Guertin's disclosure on his SF-86 (submitted one month earlier) that the Tenants were actually living in Mr. Guertin's property (as both the Tenants and Mr. Guertin had disclosed to the government).

35. According to an OIG memorandum prepared by Agent Leipfert *herself* and approved by Agent Yoder, the trash search revealed various receipts and mail-related items, among which was a temporary driver's license that had been issued to one of Mr. Guertin's Tenants on April 1, 2016, found in a "grocery bag with bathroom trash." The temporary driver's license showed that the Tenant had, consistent with Mr. Guertin's disclosure of that Tenant's status as a tenant in his home, listed Mr. Guertin's address as Tenant's address.

### *Agent Leipfert's Submission of Perjured Search Warrant Affidavits*

36. On November 8, 2016, Agent Leipfert submitted a sworn affidavit (the "Google Affidavit") to a United States Magistrate Judge in support of an application for a search warrant to obtain from Google all emails, chat conversations, and account information associated with Mr. Guertin's Gmail account from January 1, 2007, through the date of the sought warrant.

37. In the Google Affidavit, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that the facts set forth in the affidavit gave her probable cause to

believe that Mr. Guertin had violated 18 U.S.C. § 201(b) (bribery of a public official); 18 U.S.C. § 1546 (visa fraud); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 1084 (transmission of wagering information); 31 U.S.C. § 5363 (prohibited acceptance by a business of financial instruments for unlawful gambling); and 18 U.S.C. §§ 371 and 1956(h) (conspiracy).

38.     In fact, Agent Leipfert lacked probable cause to believe that Mr. Guertin had committed any of those crimes. Moreover, Agent Leipfert's Google Affidavit contained false statements and material omissions relating to virtually all of its core factual assertions.

39.     In the Google Affidavit, Agent Leipfert knowingly, deliberately, and corruptly made false statements and material omissions that were essential to the appearance of probable cause and without which a Magistrate Judge would not have had a legal basis to issue the warrant.

40.     United States Magistrate Judge G. Michael Harvey approved the warrant based on the Google Affidavit.

41.     On December 8, 2017, Agent Leipfert submitted another sworn affidavit (the "Hotmail Affidavit") to a United States Magistrate Judge in support of an application for a search warrant to obtain from Microsoft all emails, chat conversations, and account information associated with Mr. Guertin's Hotmail account from January 1, 2007, through the date of the sought warrant.

42.     In the Hotmail Affidavit, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that the facts set forth in the affidavit gave her probable cause to believe that Mr. Guertin had violated 18 U.S.C. § 201(b) (bribery of a public official); 18 U.S.C. § 1546 (visa fraud); 18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 1084 (transmission of wagering information); 31 U.S.C. § 5363 (prohibited acceptance by a

business of financial instruments for unlawful gambling); 18 U.S.C. §§ 371 and 1956(h) (conspiracy); and 18 U.S.C. § 1001 (false statements).

43.     In fact, Agent Leipfert lacked probable cause to believe that Mr. Guertin had committed any of those crimes.

44.     In the Hotmail Affidavit, Agent Leipfert knowingly, deliberately, and corruptly made false statements and material omissions that were essential to the appearance of probable cause and without which a Magistrate Judge would not have had a legal basis to issue the warrant.

45.     United States Magistrate Judge Robin M. Meriweather approved the warrant based on the Hotmail Affidavit.

### *Agent Leipfert's Material Misrepresentations and Omissions in the Search Warrant Affidavits Concerning Allegations of Bribery and Visa Fraud*

46.     Agent Leipfert's most egregious misrepresentations concerned allegations of bribery and visa fraud. She described in the both the Google and Hotmail Affidavits a December 14, 2008, email from Mr. Guertin's Gmail address to his State Department email address that listed three Chinese nationals' names and birthdates. Agent Leipfert stated that she conducted a search of the Consolidated Consular Database ("CCD"), which is the State Department's repository of visa and passport records, to determine that the three individuals had applied for non-immigrant visas at the Shanghai Consulate General where Mr. Guertin then worked. Agent Leipfert stated that Mr. Guertin "was the adjudicating official in all three cases."

47.     In one of the cases ("Applicant One"), Agent Leipfert stated that the application was initially denied as an intending immigrant (that is, an applicant who intended to immigrate unlawfully after receiving a non-immigrant visa), but that Mr. Guertin later "issued a visa" to the applicant with a comment to disregard the previous

adjudicating officer's notes. Agent Leipfert swore in both the Google and Hotmail Affidavits that, in her experience, "Guertin's comment is unusual and the favorable adjudication of that visa is questionable, which indicates a likelihood of improper or fraudulent influence over the visa application in violation of 18 U.S.C. §§ 201(b) and 1546." Agent Leipfert's sworn statement was false: Mr. Guertin was *not* the adjudicating officer in Applicant One's case, he *never* issued Applicant One a visa (in fact, Applicant One never even received a visa), and Agent Leipfert either knew her statement was false or recklessly disregarded a substantial likelihood that it was false.

48.    Agent Leipfert's case file included a document that she made herself in preparation for her search warrant application, in which she states that she "searched those names in CCD [and] determined [Mr. Guertin] had adjudicated two out of the three and *reviewed* the third." (emphasis added). The third was Applicant One. Agent Leipfert knew when she swore out the both the Google and Hotmail Affidavits that Mr. Guertin only reviewed and did not adjudicate Applicant One's visa application, but she made his alleged adjudication of Applicant One's visa application a centerpiece of her case for probable cause.

49.    The second Chinese national on the list of three names that Mr. Guertin emailed to himself was a visa applicant who wanted to travel to Abercrombie & Fitch's U.S. office for a brief business trip (the "Abercrombie Applicant"). Mr. Guertin initially interviewed the applicant on September 18, 2008, and made case notes indicating that the applicant had made prior trips to other countries, had stable employment and income, and had an invitation letter from Abercrombie & Fitch to visit its campus in the United States.

50.    Mr. Guertin wanted to be sure of the applicant's legitimacy prior to adjudicating the visa, however, so Mr. Guertin initially entered a soft refusal, referring the

matter to the Fraud Prevention Unit ("FPU") for a more detailed and independent check. (A soft refusal notes that additional administrative processing or documentation is required before the visa application can be approved, whereas a hard refusal is a firm rejection on the grounds that the person applying for a non-immigrant visa has failed to overcome the statutory presumption of intent to immigrate.) The next day, an FPU officer attempted to contact the phone and fax numbers on the applicant's invitation letter but was unsuccessful, so that officer concluded the invitation was fraudulent, added a "fraud" annotation to the applicant's file, and issued a hard refusal. But Mr. Guertin wanted to be sure that this was an accurate adjudication, so he emailed the Abercrombie & Fitch representative on the applicant's invitation letter and received a response from that representative's Abercrombie.com email address confirming that the applicant was in fact a legitimate invitee among a delegation and was scheduled to visit their campus on the dates the applicant had stated in his visa interview. The Abercrombie representative further correctly identified the name of the company that the visa applicant worked for in China and provided a list of twelve Abercrombie employees with whom the visa applicant was scheduled to meet during his visit. Mr. Guertin scanned a copy of this correspondence into the visa applicant's electronic CCD file, which was visible to Agent Leipfert.

51.     Mr. Guertin then sought and received supervisory approval to overturn the FPU officer's improper "fraud" annotation and issue the visa, which was subsequently noted in the CCD. Despite a workload that frequently required Mr. Guertin to process over one hundred visa applications a day, Mr. Guertin carried out further anti-fraud measures by requesting the participation of the applicant in a post-visa issuance validation study, to determine whether the applicant used the visa properly or overstayed in the United States. (Due to the extremely high volume of non-immigrant visa cases in Shanghai, consular

management utilized validation studies to verify the travel of a sample group consisting of less than 1% of total visa issuances. Adjudicating officers were advised to only refer their "borderline visa issuances" to this sample group, so that the information gained from the validation checks could later be utilized to statistically calibrate the consular section's adjudications as a whole.) The CCD case notes document that this subsequent validation check was conducted on January 16, 2009, by a different officer, and that the Abercrombie Applicant indeed "traveled to the U.S. and stayed for only 3 days."

52.     In short, Mr. Guertin first *requested* an independent fraud check on the Abercrombie Applicant's visa application, then verified the validity of the applicant's invitation from a U.S. company, discussed the case with his supervisor, and further requested that the case be included in a validation study, essentially seeking an audit of *himself*. This chronology—which Agent Leipfert specifically reviewed in preparation for drafting her search warrant affidavits—shows Mr. Guertin working diligently both to ensure that visa applicants neither committed fraud nor were mistakenly flagged as having tried to commit fraud. In other words, these case notes show him as an ideal public servant.

53.     In both the Google and Hotmail Affidavits, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that there was "no known legitimate explanation for why Guertin would have stored personal information about these visa applicants whose applications he adjudicated, including [Applicant One]." This sworn statement was false for multiple reasons. It was false because Mr. Guertin did not adjudicate Applicant One's visa application. It was also false because Agent Leipfert knew (or recklessly disregarded) that legitimate explanations existed for why Mr. Guertin emailed applicant names to himself. Indeed, Mr. Guertin reasonably sent himself the Abercrombie Applicant's name in order to facilitate subsequent diligence pertaining to the adjudication of that visa, and he

sent the email from his Gmail account to his work account for an obvious reason (it was a Sunday, when he was working from home and lacked access to his State Department email).

54. The three cases Mr. Guertin flagged for himself also had specific, ongoing relevance to an internal debate within the section regarding how liberally officers should grant or refuse non-immigrant visas, in addition to how well Mr. Guertin performed his job (which would be relevant for Mr. Guertin to remember during performance evaluations). A reasonable investigator with the training and experience that Agent Leipfert claimed would have known that such legitimate purposes could easily explain Mr. Guertin's email to himself.

55. Alternatively, Agent Leipfert—after reviewing the CCD record and learning that the Abercrombie Applicant was an unusual case with an especially thorough investigation resulting in the correction of an improper fraud determination by the FPU—could have contacted one of Mr. Guertin's former supervisors in the consular section to clarify the facts. Instead, Agent Leipfert never attempted to contact *any* of Mr. Guertin's former supervisors or colleagues to verify *any* of the false claims she made in both the Google and Hotmail Affidavits. Moreover, Agent Leipfert's omission of all of the aforementioned facts concerning the Abercrombie Applicant, which Agent Leipfert specifically reviewed in the CCD, was a material omission that Agent Leipfert employed intentionally in order to mislead both magistrate judges into finding probable cause to believe that Mr. Guertin was guilty of bribery or visa fraud. The materiality of this omission with regard to the Abercrombie Applicant is itself shown by Agent Leipfert's use of the CCD record for Applicant One: there, Agent Leipfert's review of the CCD record was the centerpiece of her false claim that Mr. Guertin's "favorable adjudication" of Applicant

One's visa indicated a likelihood of visa fraud. The CCD record for the Abercrombie Applicant would, thus, likewise be highly material to understanding the email Mr. Guertin sent to himself.

56.     Had Agent Leipfert contacted the Consular Section Chief or his Deputy (the Non-Immigrant Visa Chief), she would have learned that Mr. Guertin was extremely diligent and mindful of fraud while performing his duties as a visa officer. Mr. Guertin's supervisors wrote in his second annual EER from Shanghai, which was visible to Agent Leipfert, "Ever mindful of fraud, Paul is one of the few officers who actually spotted fake Chinese passports while conducting visa interviews at the window (he identified four fake passports on two separate occasions). Paul particularly shone during his time in the Fraud Prevention Unit ('FPU'). Sparked by his discovery of a Chinese citizen claiming a fraudulent parent-child relationship with an American citizen, Paul conducted a thorough investigation that exposed a wide network of fraudulent parents purchasing fake documents in New York City. Through the extensive use of a text search function on the Consular Consolidated Database ('CCD') FPU was able to link together seemingly unrelated cases and uncover a fraud ring of unprecedented breadth and depth that had operated for at least seven years. Paul's subsequent analysis and communication with other U.S. visa issuing posts revealed a China-wide total of over 300 fraudulent visa applications. Due in no small part to Paul's sleuthing, the U.S. Mission successfully identified and refused these applications at the interview window. Paul completed the case by coordinating with the Regional Security Office and other China posts, adding misrepresentation hits into the system for each fraudulent applicant from the Shanghai Consular District (thus making them permanently ineligible for visas)."

57.     In the Google Affidavit, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that "there is probable cause to believe that Paul Guertin, a State Department Foreign Service Officer, has conspired with other individuals known and unknown to solicit payments from aliens in exchange for facilitating visa applications through the State Department and to launder the proceeds thereof, and that evidence of these violations is stored in [Guertin's Gmail Account]." This attestation was false because, on information and belief, Agent Leipfert knew there was no probable cause to believe that Mr. Guertin had ever solicited such payments. Despite Agent Leipfert's unfettered access to Mr. Guertin's complete financial records, Google metadata and contact history, and government email account, Agent Leipfert did not cite *one single* transaction to substantiate her sworn testimony that Mr. Guertin was soliciting payments for favorable visa treatment, which was the most serious of Agent Leipfert's many false allegations.

58.     In the Hotmail Affidavit (executed over a year after the Google Affidavit), Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin's contacts with a handful of visa applicants constituted evidence of visa fraud and bribery. Having already obtained and reviewed Mr. Guertin's Gmail records, Agent Leipfert was fully aware that Mr. Guertin's communications with these applicants were personal in nature and did not involve bribery or visa fraud.

59.     Additionally, Mr. Guertin's communications with these few visa applicants were all *after* Mr. Guertin's adjudication of their visas, a key fact that Agent Leipfert deliberately omitted from both the Google Affidavit and the Hotmail Affidavit in order to mislead the magistrate judges into finding probable cause to believe that Mr. Guertin was guilty of bribery or visa fraud. Agent Leipfert stated in both affidavits that "if a consular officer has a relationship with an applicant the consular officer is expected to recuse himself

from the adjudication of that visa. Therefore, Guertin's pattern of personal communications with [Applicant Two] appears to be improper and highly unusual." Agent Leipfert knew, however, that Mr. Guertin had only communicated with the applicant after final adjudication of the visa, meaning there was no "relationship" prior to the adjudication, there was thus no basis for recusal, and there was thus no probable cause to believe that the *subsequent* email communication was evidence of anything "improper and highly unusual," let alone criminal.

60.     In the Hotmail Affidavit, under a heading "Suspected Visa Fraud, Bribery, & False Statements," Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that the Tenants "residing in Guertin's residence actually purchased 33.33% ownership interest in his property. A contract to this effect was signed by Guertin, [the Tenants,] and a notary on April 14, 2015. This business arrangement was not disclosed in Guertin's SF-86."

61.     In fact, as reflected in the agreement reviewed by Agent Leipfert, the Tenants had simply agreed to issue a loan to Mr. Guertin, to be collateralized by 33.33% of the value of his residence. Upon the loan's maturity in 2021, they would have 30 days to *request* repayment by a 33.33% ownership interest in the property, but they did not purchase, and had no *right* to receive, an ownership interest. Rather, even though the agreement permitted them to request an ownership stake four years after Agent Leipfert swore out the Hotmail Affidavit, Mr. Guertin could reject the request by repaying the loan in cash instead. This deliberate false statement was material because, as Agent Leipfert knew, the SF-86 required applicants to disclose business ventures with foreign nationals (specifically including co-ownership), but the SF-86 did not require applicants to disclose loan agreements with foreign nationals.

62.    In 2021, Agent Leipfert repeated this misrepresentation to the grand jury that indicted Mr. Guertin.

### Agent Leipfert's Material Misrepresentations and Omissions in the Search Warrant Affidavits Concerning Allegations of Money Laundering and Crimes Related to Unlawful Gambling

63.    In both the Google and Hotmail Affidavits, Agent Leipfert also made serious misrepresentations concerning Mr. Guertin's financial transactions to support the allegations of probable cause for money laundering and gambling business offenses. Agent Leipfert described the Tenants (discussed above, and described as "PERSON A" and her spouse in the affidavit) as Chinese nationals who had paid "more than $25,000 in payments to Guertin" via PayPal. Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that "[b]ased on evidence collected on or about May 3, 2016, from trash discarded from Guertin's Washington, D.C. house, as well as records associated with Guertin's PayPal account, Guertin appears to rent out his house to legitimate residents, but no evidence was recovered showing that PERSON A and/or her spouse have lived at Guertin's house." Agent Leipfert falsely presented this statement in support of the money laundering allegations. But Agent Leipfert knew it was false because she *personally* drafted the memo documenting the results of this trash search, in which a temporary driver's license belonging to one of the Tenants and listing Mr. Guertin's home as that Tenant's residential address had been found. Furthermore, Agent Leipfert continued to allege that these payments (with each payment occurring on the first or last day of the month, making them consistent with rental payments) were the laundered proceeds of visa fraud, even though these financial transactions occurred more than *five years after* Mr. Guertin ceased work as a Consular Officer in February 2010 with any ability to exert influence over a visa application.

64.     Agent Leipfert claimed in the Google Affidavit that these payments were evidence of "individuals involved in an illegal enterprise [who] sometimes attempt to conceal illicit financial activity by disguising it as a legitimate transaction." But Agent Leipfert knew (or recklessly disregarded) that the Tenants were in fact individuals who legitimately rented a bedroom in Mr. Guertin's home, a fact that Mr. Guertin had truthfully disclosed on his 2016 SF-86 seven months prior to the Google Affidavit.

65.     In the Google Affidavit, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin used his Gmail address together with his State Department email address "to organize large-scale gambling pools . . . and to facilitate the transfer of at least $200,000 on behalf of himself and others in connection with these activities."

66.     In reality, Agent Leipfert knew or recklessly disregarded the fact that Mr. Guertin's gambling activity was nowhere near that magnitude. Agent Leipfert knew, for instance, that Mr. Guertin's March Madness pools—which she spent five paragraphs discussing in both the Google and Hotmail Affidavits under the heading "Suspected Illegal Gambling Business Activity"—involved at most a few dozen people wagering a token entry fee of just $20 apiece. Specifically, Mr. Guertin organized a total of just five $20 buy-in March Madness and World Cup pools throughout the ten-year reach of Agent Leipfert's investigation. Other Foreign Service Officers and even ambassadors participated in Mr. Guertin's recreational pools, and Mr. Guertin took no "house fee" or profit for organizing the pools, which were typically conducted over private email after an initial announcement from Mr. Guertin's government email account. The largest of these recreational March Madness pools that Mr. Guertin hosted had just 39 entrants, with a total prize pool of $780. Agent Leipfert knew this and deliberately omitted these highly material facts from the

magistrate judges. Additionally, none of Mr. Guertin's alleged personal financial transactions relating to online poker or fantasy sports approached six figures.

67.     In both the Google and Hotmail Affidavits, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that based on her training and experience, it was likely that Mr. Guertin's financial transactions to overseas companies were evidence of illegal online gambling. Agent Leipfert knew (or recklessly disregarded) that both of the relevant federal gambling statutes she cited in the Google and Hotmail Affidavits (the Federal Wire Act, 18 U.S.C. § 1084, which prohibits transmission of wagering information, and the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA"), 31 U.S.C. § 5363, which prohibits acceptance by a business of financial instruments for unlawful gambling) apply only to persons engaged *in the business of* betting or wagering, a requirement that a DOJ attorney specifically highlighted for OIG at the outset of the investigation.

68.     Agent Leipfert also knew (or recklessly disregarded) that the UIGEA neither criminalizes recreational online gambling (including online poker) nor preempts local laws permitting individuals to gamble or regulating such individuals. Furthermore, in a review of Mr. Guertin's State Department emails, Agent Leipfert specifically flagged a lengthy email correspondence in which Mr. Guertin sent the entire text of the UIGEA to David Murray, the Treasury Attaché to the U.S. Embassy in Islamabad, as part of a detailed discussion on the legality of online poker. As would have been known to any government investigator with the training and experience claimed by Agent Leipfert, poker websites were hosted internationally and often utilized international companies to facilitate money transfers. On information and belief, Agent Leipfert knew that Mr. Guertin was not in the business of betting or wagering, and she knew (or recklessly disregarded) that his

international financial transactions were related to his lawful hobby of playing recreational online poker.

69.     In the Google Affidavit, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that "the high volume of [Mr. Guertin's cash casino transactions] is suggestive of an income source beyond Guertin's known employment with the State Department." As the government has conceded, the gross figures provided by Agent Leipfert double-count deposits and withdrawals, including the same small volumes of funds deposited and withdrawn on different days. Agent Leipfert knew (or recklessly disregarded) that these gross figures were essentially meaningless and could not support an inference that Mr. Guertin had an additional source of income beyond his State Department salary. Agent Leipfert deliberately and deceptively omitted the material fact that Mr. Guertin's net expenditures at casinos were *far* lower than the gross transaction amounts. Agent Leipfert's bare assertion that "gambling *can* be used as a money laundering technique," without any facts showing that Mr. Guertin was actually laundering money, was insufficient to support probable cause for the money laundering allegations.

70.     In the Google Affidavit, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that "FanDuel is a website that facilitates fantasy sports competitions for cash payouts, which may also be used as a platform for online sports gambling." This statement was false. FanDuel was a legal and regulated fantasy sports competition website that competes with DraftKings, a U.S.-based publicly traded company, and that did not offer sports gambling at all during any relevant time period. FanDuel did not begin to offer sports gambling until *after* the Supreme Court's 2018 decision in *Murphy v. NCAA*, 138 S. Ct. 1461 (2018). Rather, FanDuel provided legal, skill-based fantasy sports competitions that were *expressly* recognized as lawful by the UIGEA, and that had a

detailed record system that could not be used as a money laundering technique. Notably, Agent Leipfert repeated this false statement that Mr. Guertin engaged in "sports betting" on FanDuel to the grand jury, despite the publicity that *Murphy* brought to FanDuel and to the distinction between fantasy sports and sports gambling.

### *Agent Leipfert's Other Material Misrepresentations and Omissions in the Search Warrant Affidavits*

71.     Agent Leipfert also made other misrepresentations in both the Google and Hotmail Affidavits. Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin worked at the Bureau of Intelligence and Research (INR) from 2011 through 2014, rather than through 2012, misleading the reader into thinking that Mr. Guertin had access to sensitive information at the highest levels of classification for far longer than he actually did. Agent Leipfert made this false statement despite having reviewed and created numerous documents describing Mr. Guertin's actual employment history, and despite reviewing his official emails, where his actual job title of "Indonesia Desk Officer" in the "Bureau of East Asian and Pacific Affairs" was included on the signature line of nearly every official email he sent from 2012 to 2014.

72.     In both the Google and Hotmail Affidavits, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin's communications with and concerning a non-immigrant visa applicant in Indonesia in 2007 were likely to reveal evidence of undue influence. Agent Leipfert deliberately omitted the material facts that (1) the applicant in that case was Mr. Guertin's *girlfriend* at the time, (2) the applicant did not receive a visa until four years *after* they ceased communicating with each other, and (3) Mr. Guertin had no involvement with the eventual issuance of her visa. Agent Leipfert falsely stated that this applicant's visa application was denied because "the adjudicating officer believed [this applicant] was an intending immigrant." In fact, in an official email,

the former head of the U.S. Consular Section in Jakarta explained to Mr. Guertin that the denial was merely reflective of the standard of review—which places the burden of proof on the applicant—and encouraged him to write a letter on the applicant's behalf. Agent Leipfert deliberately omitted this highly material information to suggest that Mr. Guertin's involvement in this applicant's attempt to obtain a non-immigrant visa supported a finding of probable cause.

73.     Moreover, Agent Leipfert's assertion that the content of Mr. Guertin's communications with this applicant from 2007 to 2009 will "likely contain evidence . . . that will determine if Guertin had undue influence over the issuance of [this applicant's] 2013 visa"—which was issued four years after Mr. Guertin and the applicant ceased communicating—is false. Mr. Guertin was not even aware that this applicant was issued a visa until he read the search warrant affidavit, and the applicant's CCD records, which were visible to Agent Leipfert, would have shown the reasons the visa was granted and the lack of any involvement by Mr. Guertin after 2007. Agent Leipfert knew that the applicant was Mr. Guertin's girlfriend and she deliberately omitted material facts that would have made clear that Mr. Guertin's involvement with this applicant could not support probable cause.

74.     In both the Google and Hotmail Affidavits, Agent Leipfert stated that Mr. Guertin "is associated with 23 Class B referrals in Islamabad, Pakistan from when he was stationed there in 2010," and that, "based on my knowledge and experience, 23 is an unusually large number of referrals for a one-year period." Agent Leipfert's material omissions in this allegation were deliberate and misleading. First, the "23 Class B referrals" (actually 22) represent just fourteen cases of Pakistanis whom Mr. Guertin referred for non-immigrant visas. They were fourteen VIP contacts of the U.S. Embassy's economic section,

along with eight accompanying family members. As Mr. Guertin's former supervisor in Pakistan (the head of the economic section) would later affirm in a sworn affidavit, there was a deep need for well-qualified visa referrals to build closer government and business ties between Pakistan and the United States, and identifying such candidates was one of Mr. Guertin's core work requirements. Indeed, Mr. Guertin's 2011 EER documenting his work in Pakistan also highlights this fact, stating, "Despite the fact that Pakistan has one of the largest U.S. assistance programs in the world, many Pakistanis hold the United States in low regard. To change that, we have ramped up our International Visitor program, which sends Pakistanis whom we identify as key future decision and opinion makers to the United States to see how Americans live and work. Paul again took the initiative in coordinating the Economic Section's nomination process, which resulted in 28 nominations of Pakistanis whom we believe will work to improve ties between our countries."

75.     Agent Leipfert deliberately mischaracterized Mr. Guertin's work as an Economic Officer in Pakistan. Each of these fourteen Class B referrals contained robust, detailed written justifications, and each was explicitly approved by a supervising officer (either the head of the economic section or his deputy). For example, one referral stated: "Mr. [Redacted] is the Director for Economic Affairs at Pakistan Telecom Authority (PTA), Pakistan's telecommunications regulator. He is a valuable economic section contact and has been a consistent and reliable source of information about government policy in the telecom sector for many years. The U.S. Telecommunications Training Institute (USTTI) hosts hundreds of telecommunication regulators and experts from around the world in dozens of training courses designed to enhance participants' knowledge, expertise, and professionalism, and to foster greater communication and exchanges between U.S. experts

and their counterparts abroad. The economic section requests that you give all due consideration to Mr. [Redacted] and his family's visa applications."

76.     Another referred applicant was Pakistan's Secretary of Commerce at the time. These were not personal visa referrals by Mr. Guertin but were submitted by him in his capacity as an economic officer for the benefit of the economic section as a whole. These referrals were designed to advance U.S. policies and interests in Pakistan. All of Mr. Guertin's visa referrals from Pakistan adhered to official State Department guidance and the instructions of his supervisors, none were in any way inappropriate or unjustified, and none had any personal contact with him outside of his official responsibilities as an economic officer.

77.     Agent Leipfert's deliberate omission of these facts from her affidavits misled the magistrate judges to believe that Mr. Guertin's case referrals were evidence of a suspicious abuse of power rather than his exemplary promotion of U.S. political and economic interests.

78.     In both the Google and Hotmail Affidavits, Agent Leipfert relied extensively on *ipse dixit* statements regarding the inculpatory nature of evidence based on her "training and experience." These unsupported assertions were false. On information and belief, Agent Leipfert, who started working at OIG less than a year before submitting the Google Affidavit and who was assigned to Mr. Guertin's case mere days after joining the State Department, did not have the required training or experience to support her allegations for probable cause in the affidavits.

79.     On information and belief, Agent Leipfert made the aforementioned false statements and material omissions in both the Google Affidavit and the Hotmail Affidavit

because she was on a fishing expedition to gain access to ten years of Mr. Guertin's personal emails in order to find something—*anything*—to charge him with.

80.    Agent Leipfert's aforementioned false statements and material omissions were essential to the findings of probable cause and thus to the issuance of the search warrants for Mr. Guertin's Google and Hotmail accounts. But for the aforementioned misrepresentations and omissions, neither the Google Affidavit nor the Hotmail Affidavit would have provided probable cause to believe Mr. Guertin had committed any of the offenses listed therein.

81.    But for United States employees' negligent supervision of Agent Leipfert, Agent Leipfert would not have submitted the Google Affidavit or the Hotmail Affidavit, with the numerous false statements and material omissions that they contained, to the magistrate judges who relied on those affidavits to approve the search warrants. Thus, but for the negligent supervision of the United States and its employees acting within their scope of employment, Agent Leipfert would not have been able to procure the search warrants.

82.    Agent Leipfert submitted both the Google Affidavit and the Hotmail Affidavit within the scope of her employment.

83.    Agent Leipfert's decision whether to submit the Google Affidavit did not require Agent Leipfert to balance competing policy interests. Agent Leipfert's decision to submit the Google Affidavit was not actually or potentially influenced by policy considerations.

84.    Agent Leipfert's decision whether to submit the Hotmail Affidavit did not require Agent Leipfert to balance competing policy interests. Agent Leipfert's decision to

submit the Hotmail Affidavit was not actually or potentially influenced by policy considerations.

### *Agent Leipfert's Material Misrepresentations and Omissions to the Grand Jury*

85. On March 15, 2021, Agent Leipfert appeared to testify before a grand jury in the U.S. District Court for the District of Columbia. As the main investigating agent for over five years, Agent Leipfert was intimately familiar with Mr. Guertin's email communications, finances, State Department career, and other relevant facts.

86. Agent Leipfert was the government's sole witness before the grand jury, and she knowingly presented highly misleading, perjured, and inflammatory testimony in that proceeding. Agent Leipfert repeated many of the same false statements to the grand jury that were in her affidavits, while omitting highly material information known to her that was necessary to prevent her testimony from being misleading.

87. In just *one hour* of testimony, as set forth in greater detail in subsequent paragraphs, Agent Leipfert (1) misrepresented that Mr. Guertin worked at INR for three years rather than one year; (2) falsely claimed that Mr. Guertin inappropriately shared sensitive information; (3) falsely stated that Mr. Guertin was curtailed from Taipei, Taiwan and that he never commenced his assignment as Political Unit Chief in Chengdu, China, where he had in fact been working for almost a year; (4) misrepresented the standard for disclosing foreign contacts; (5) falsely stated that Mr. Guertin had acted unusually by accessing past visa applications; (6) falsely stated that Mr. Guertin had a personal relationship with a Chinese national until at least July 2009, while failing to disclose that they had broken up in January 2009, which placed that relationship outside the seven-year window for required disclosure on Mr. Guertin's 2016 SF-86; (7) falsely stated that Mr. Guertin had engaged in sports betting through FanDuel and DraftKings; (8) falsely stated

that Mr. Guertin had run into financial problems due to gambling during his tenure at the State Department; (9) falsely stated that Mr. Guertin's loan from the Tenants gave them a "vested" ownership stake in his house; (10) falsely stated that the Tenants had the right to insist on an ownership interest in Mr. Guertin's house at the end of the loan period; (11) omitted the material fact that Mr. Guertin's SF-86 disclosure indicated that his relationship with the Tenants involved "business"; (12) falsely stated that Mr. Guertin had a degree in economics; and (13) falsely and prejudicially claimed that Mr. Guertin's chat and email communications with his girlfriend from thirteen years earlier revealed "very disgusting [sexual] things that you would not want to see and hear."

88.    Agent Leipfert's false statements and material omissions substantially influenced the grand jury and contributed to its decision to indict Mr. Guertin.

89.    In her sworn testimony, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin was assigned to INR from August 2011 until September 2014. Agent Leipfert testified, "as a desk officer in the Bureau INR, he would have been exposed to very highly sensitive information related to foreign policy and the security of our diplomats abroad." In reality, Mr. Guertin was a Special Assistant at INR, not a desk officer—and he spent one year in that bureau, not three. Agent Leipfert's case file is replete with documents she reviewed and created showing her knowledge of Mr. Guertin's one-year tour at INR, which was documented on his 2016 SF-86 submission, in his personnel folder, on his annual performance evaluations, and on the signature line of most of his official emails. Furthermore, in October 2020, Agent Leipfert interviewed a security advisor at INR, who again expressly informed her of Mr. Guertin's actual assignment dates at the bureau. Agent Leipfert captured this information in a memorandum that *she herself* drafted, and which was approved by Agent Baumgart. Agent Leipfert thus

knowingly gave perjured testimony before the grand jury, exaggerating both the duration and nature of Guertin's assignment at INR to paint him as a national security threat.

90.    In her sworn testimony, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin was sharing sensitive, non-public information with people that had no right to know. In response to a question from a grand juror asking whether Mr. Guertin had access to nonpublic information in his job, Agent Leipfert responded, "[Mr. Guertin] had access to very, very sensitive information that is not publicly available," and "my review of his emails and through the warrants and what have you, revealed that he was sharing a lot of that very private information, if you will, sensitive information with people that had no right to know." Agent Leipfert misleadingly and prejudicially implied to the grand jury, with no evidentiary basis whatsoever, that Mr. Guertin was revealing classified information to "people who had no right to know." Agent Leipfert knew that Mr. Guertin had a completely clean security record in his more than decade of service at the State Department, with zero security infractions and zero security violations, and she knew that each of his annual performance reviews highlighted that he took extreme care to protect and secure classified information.

91.    Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin was curtailed from Chinese language training in Taipei, Taiwan, and that he never commenced his assignment as Political Unit Chief in Chengdu, China. In reality, Mr. Guertin completed his language training in Taiwan in June 2016, and then transferred to the U.S. Consulate General in Chengdu, China, where he served with distinction as the Political Unit Chief for nearly a year. Mr. Guertin's EER for this assignment, which was submitted in May 2017 and was visible to Agent Leipfert, highlighted his exceptional performance and diligence in promoting U.S. political interests while serving abroad in

China. On information and belief, Agent Leipfert's false statement and material omissions regarding these facts were designed to obscure from the grand jury Mr. Guertin's notable contributions to advancing U.S. foreign policy interests while serving abroad, and to falsely portray him as a national security threat who could not be trusted. Indeed, Agent Leipfert *herself* requested the suspension of Mr. Guertin's security clearance in 2017, which directly led to him being curtailed from his assignment in Chengdu, China.

92.    Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that "Mr. Guertin was required to report any contacts he had with foreign nationals while abroad." This statement, which Agent Leipfert highlighted on two separate occasions in her grand jury testimony, was false and highly misleading, as it misrepresented the actual standard for required disclosures of foreign contacts on the SF-86. The SF-86 requires applicants to disclose *only* "close and/or continuing contact with a foreign national **within the last seven (7) years**, with whom you, or your spouse, or cohabitant are bound by affection, influence, common interests, and/or obligation" (emphasis in original). Agent Leipfert knew (or recklessly disregarded) that this standard would not include someone that Mr. Guertin "hung out once for a beer" with at a bar, which was the example that Agent Leipfert nevertheless gave to the grand jury in Grand Jury Exhibit 4. This misrepresentation was material because Agent Leipfert was pursuing an indictment specifically for Mr. Guertin's alleged failure to make a required disclosure of a relationship with a Chinese national, when she knew that Mr. Guertin's relationship with that Chinese national had ended more than seven years prior to Mr. Guertin's April 3, 2016 submission of his SF-86.

93.    Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin had acted unusually by accessing past visa applications. This characterization was false because all consular officers routinely access and review past adjudications to ensure

quality control, conduct fraud reviews, update cases with new information, and enroll visa recipients in post-issuance validation studies, among other reasons.

94.    Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin had a personal relationship with a Chinese national until at least July 2009, while failing to disclose that they had broken up in January 2009, which placed that relationship outside the seven-year window for required disclosure on his April 3, 2016 SF-86. Mr. Guertin's only contact with this Chinese national after January 2009 consisted of a single email exchange in July 2009, six months after the relationship had ended.

95.    Agent Leipfert also mischaracterized this Chinese national's need for a new visa, stating falsely that she had to reapply after a year because she received a limited duration visa to ensure she returned to her country. In fact, the Chinese national's 2008 student visa would have allowed her to remain in the U.S. for the duration of her master's degree program, but she needed a new visa in 2009 because she voluntarily returned to China to visit her mother. Mr. Guertin had no role in the adjudication of this 2009 visa.

96.    Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin engaged in sports betting through FanDuel and DraftKings. As discussed above in paragraph 70, these websites, which facilitated the majority of Mr. Guertin's transactions, did not offer sports betting or other forms of gambling prior to 2018. Rather, they were lawful fantasy-sports competition websites where fans competed against each other to win cash prizes based on their skill in selecting individual players, playing the role of a fictional team's general manager.

97.    Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin had run into financial problems due to gambling during his tenure at the State Department. This statement was false, and it implicated a central issue for the grand jury

to decide. Mr. Guertin did not in fact face any financial problems due to gambling, and at no time during his tenure at the State Department did Mr. Guertin have a negative net worth or carry overall indebtedness. For every one of those years, Mr. Guertin's net worth was positive, usually to the tune of at least $200,000. Agent Leipfert had complete access to Mr. Guertin's financial history, financial transactions, and emails showing the appreciating value of his home each year. But Agent Leipfert eschewed this complete picture in favor of highlighting a few isolated, prejudicial, and misleading anecdotes. Agent Leipfert's material omissions in her grand jury testimony regarding Mr. Guertin's positive overall financial situation and high net worth were misleading and prejudicial.

98.    Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin pledged collateral to the Tenants as a "vested one-third interest in [Mr. Guertin's] property." Agent Leipfert further knowingly, deliberately, and corruptly stated, falsely, that the Tenants had the right to insist on an ownership interest in Mr. Guertin's house at the end of the loan period, again implicating an express category of required disclosures. Explaining this "vested interest," Agent Leipfert told the grand jury that the Tenants had the "option of whether to get repaid or . . . to take an ownership interest." These statements were false. The Tenants did not ever have a "vested interest" in Mr. Guertin's home. The Tenants could not dictate to Mr. Guertin whether to repay the loan with interest or award them a one-third interest in his house. Instead, under the plain terms of the agreement, Mr. Guertin controlled whether he wished to repay the loan with interest or satisfy the loan through relinquishing a one-third interest in his house. Agent Leipfert used this perjured testimony to falsely allege that the loan was actually a co-ownership business arrangement and thus was reportable on Mr. Guertin's SF-86. This was a significant and material distinction that went to the heart of the issue the grand jury was tasked to decide, because

the SF-86 does not contain any obligation to disclose loan agreements with foreign nationals.

99.     Agent Leipfert, in showing the grand jury a portion of Mr. Guertin's disclosure regarding the Tenants as Grand Jury Exhibit 10-C, excluded the portion of that disclosure in which Mr. Guertin truthfully checked "Professional or Business" to describe his relationship with them. This was a highly material omission.

100.    In response to a direct question from a grand juror, Agent Leipfert knowingly, deliberately, and corruptly stated, falsely, that Mr. Guertin had a degree in economics. This was a material misrepresentation given the economic nature of the SF-86 questions regarding "financial problems" and "business venture." In fact, Mr. Guertin's degree is in political science.

101.    When asked by a grand juror whether Mr. Guertin's romantic relationship with the Chinese national that he dated from June 2008 to January 2009 had been sexual, Agent Leipfert did not simply state "yes"; rather, she responded with personal disgust, stating, without any factual support whatsoever, that she "read through a lot of email and chat that revealed very disgusting things that you would not want to see and hear." This caused the grand juror to exclaim, "Okay. Whoo. Okay." Even the prosecutor was taken aback by this answer and interjected, "But these are all perfectly fine between two consenting adults." Agent Leipfert nevertheless continued, "Yes. Just not if you're on the outside reading it."

102.    Much like the rest of her perjured testimony, the basis of Agent Leipfert's "disgust" is a mystery. Nothing in Mr. Guertin's communications with his girlfriend at the time about consensual sexual activity would reasonably cause anyone to raise an eyebrow,

but Agent Leipfert falsely presented a narrative to the grand jurors to prejudice them into believing otherwise.

103.    This testimony infected the grand jury with virtually every form of prejudice, from false statements about the key questions, to material omissions about the key questions, to highly inflammatory allegations of breaching national security, to completely irrelevant and baseless insinuations of sexual perversion, all from a single case agent.

### *Mr. Guertin's Indictment: False Charges of Wire Fraud and Obstruction*

104.    On March 29, 2021—five days before the statute of limitations was set to expire—the grand jury indicted Mr. Guertin on two counts: one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of obstructing an official proceeding, in violation of 18 U.S.C. § 1512(c)(2).

105.    The indictment alleged that Mr. Guertin committed wire fraud by making three misrepresentations on his 2016 SF-86 in order to retain his clearance and "unlawfully enrich himself by maintaining his State Department employment and salary." These allegations were false. First, the indictment alleged that Mr. Guertin improperly failed to disclose a romantic relationship with a Chinese national on his 2016 SF-86. This is the relationship discussed in paragraphs 92 and 94.

106.    Second, the indictment falsely alleged that Mr. Guertin improperly failed to disclose on his 2016 SF-86 that he had faced financial problems due to gambling. This allegation was false. Mr. Guertin did not in fact face any financial problems due to gambling, and the government's material omission of Mr. Guertin's positive overall financial situation and high net worth was misleading and prejudicial. Moreover, Agent Leipfert falsely stated that Mr. Guertin's organization of just five $20 buy-in March Madness and World Cup pools over the ten-year reach of her investigation amounted to

"large scale gambling pools" and evidence of "suspected illegal gambling business activity," she falsely stated that there was probable cause to believe that Mr. Guertin conspired "to facilitate the transfer of at least $200,000 on behalf of himself and others in connection with these activities," she falsely stated that Mr. Guertin's recreational participation in online poker games was illegal, she falsely stated that Mr. Guertin's recreational participation in fantasy sports contests on FanDuel constituted "sports betting," and she falsely claimed that Mr. Guertin's modest net cash casino transactions were suggestive of an unreported income source beyond his known employment with the State Department.

107.    Third, the indictment falsely alleged that Mr. Guertin improperly failed to disclose a loan agreement with the Tenants on his 2016 SF-86. This was a false allegation both because there was no obligation in the SF-86 to disclose loan agreements with foreign nationals, and because Mr. Guertin's landlord-tenant relationship with the Tenants had been previously disclosed by all parties on official government documents—Mr. Guertin's SF-86 and the Tenants' visa application forms—as discussed above in paragraphs 20 and 61. Agent Leipfert's perjured testimony that the Tenants "residing in Guertin's residence actually purchased 33.33% ownership interest in his property" was used to falsely allege that the loan was actually a co-ownership business arrangement, and thus was reportable on Mr. Guertin's SF-86.

108.    Fourth, the indictment falsely alleged that Mr. Guertin obstructed an official proceeding by failing to make the same three disclosures alleged in the wire fraud allegations. This was false for the same reasons listed above.

109.    But for the content of the emails retrieved from the unconstitutionally obtained Google and Hotmail warrants, the indictment would never have issued.

110.    Mr. Guertin was never charged with bribery, visa fraud, money laundering, transmitting wagering information, accepting financial instruments for unlawful internet gambling, false statements, or conspiracy—*i.e.*, the charges in support of which Agent Leipfert submitted her perjured affidavits. Mr. Guertin never committed the outrageous crimes of bribery, visa fraud, money laundering, transmitting wagering information, accepting financial instruments for unlawful internet gambling, false statements, or conspiracy.

### *Mr. Guertin's Complete Exoneration of All Charges*

111.    Mr. Guertin moved to suppress the evidence that Agent Leipfert obtained as the result of her unconstitutional search of Mr. Guertin's personal email accounts, and he moved for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). In an oral opinion issued on December 15, 2021, the Court denied both that motion and Mr. Guertin's request for a *Franks* hearing.

112.    Mr. Guertin moved to dismiss the indictment both for failure to state an offense and also for government misconduct before the grand jury, namely through the misleading and prejudicial testimony of the government's sole witness, Agent Leipfert. In a written opinion issued on January 24, 2022, the Court granted the motion to dismiss both counts of the indictment for failure to state an offense, and the Court declined to review the misconduct allegations because Mr. Guertin was the prevailing party on the merits. The district court's rulings on the motion to suppress and the motion for a *Franks* hearing were not essential to the final judgment that was entered in Mr. Guertin's favor.

113.    For the wire fraud count, the district court stated, "the government's theory here attempts to resurrect a now discredited, overbroad use of these statutes," and held that "an indictment must allege the defendant engaged in a scheme to obtain 'property or

money.' Because the indictment here solely alleges that Guertin sought to maintain his pre-existing salary, it does not state an offense under § 1343." For the obstruction count, the district court held that "[it] is unambiguous—an informal, routine agency action like a clearance adjudication does not fall within the statutory definition of an 'official proceeding,'" and "therefore does not state an offense under § 1512(c)(2)."

114.   The government appealed the dismissal of only the wire fraud count to the D.C. Circuit, and Mr. Guertin appealed the denial of the motion to suppress to the same court. The D.C. Circuit consolidated the two appeals and a panel of that court unanimously affirmed the dismissal of the indictment. The D.C. Circuit declined to review the denial of the motion to suppress because Mr. Guertin was the prevailing party on the merits. The Court stated in its ruling, "Employers typically have great discretion in establishing conditions of employment, as they see fit. However, in light of the Supreme Court's pronouncements, it surely cannot be said that an employee's breach of any important condition of employment that is facilitated by wire transmission is tantamount to a 'scheme' to defraud the employer of 'money or property' in violation of section 1343. This is not the law."

115.   Mr. Guertin exhausted his administrative remedies. On March 27, 2023, Mr. Guertin caused a statement of claim to be delivered to the State Department. This claim, on form SF-95, included a sum certain demand for $3,820,335 in damages from lost income, lost benefits, loss of future potential earnings, attorney's fees, travel and lodging expenses, and personal injury (pain, suffering, and emotional distress). On March 28, 2023, the State Department acknowledged receipt of Mr. Guertin's submission. More than six months have elapsed therefrom without a decision.

116.    The decision of the D.C. Circuit resulted in a favorable termination of the proceedings for Mr. Guertin on May 16, 2023.

117.    But for Agent Leipfert's unconstitutional and unlawful false statements and material omissions, Mr. Guertin would never have been prosecuted.

118.    Mr. Guertin faced a potential penalty of up to 20 years of federal imprisonment and a $1 million fine—the forfeiture of a career's worth of compensation for work he actually and ably performed—from this malicious prosecution. The ensuing media coverage of Mr. Guertin's indictment included numerous speculative and prejudicial articles that irreparably impugned Mr. Guertin's previously stellar reputation. Mr. Guertin's indictment continues to appear as a top search result for a Google search of his name. And new judicial opinions in other, entirely unrelated cases have even cited Mr. Guertin's criminal proceedings in a way that falsely characterizes him as having lied on his SF-86. *See United States v. Porat*, 76 F.4th 213, 227 (3d Cir. 2023) (explaining the D.C. Circuit's ruling on Mr. Guertin's case as "upholding the dismissal of a wire fraud indictment against a foreign service officer *who lied about* his relationships and finances to maintain his Top Secret security clearance" rather than, at a minimum, stating that Mr. Guertin "allegedly" lied) (emphasis added). From day one, Mr. Guertin has remained steadfast in maintaining his innocence, which is why he repeatedly refused to plead guilty to a lesser charge despite the immense pressure that the government brought to bear on him.

119.    Agent Leipfert's corrupt deprivation of Mr. Guertin's constitutional rights cost him his livelihood and his future. But for her actions, Mr. Guertin would have continued to progress through the ranks at the State Department—as his supervisors predicted year in and year out in their annual reviews of him. Apart from his lost income and future earning potential, Mr. Guertin has also suffered emotional distress, pain and

suffering, costs of defending himself (including attorney fees, travel, and lodging expenses), and immense permanent reputational harm from falsely being smeared as a criminal.

## V.      Causes of Action

**COUNT I**
**FEDERAL TORT CLAIMS ACT**
**(MALICIOUS PROSECUTION)**

120.    Mr. Guertin incorporates by reference all of the preceding paragraphs of this Complaint.

121.    Agent Leipfert is an employee of the United States.

122.    All of the actions taken by Agent Leipfert and referred to in the preceding paragraphs were within the scope of Agent Leipfert's employment.

123.    Agent Leipfert initiated and continued the prosecution of Mr. Guertin, she did so without probable cause, and she did so knowingly, corruptly, and maliciously—that is, with a primary purpose other than to bring an offender to justice.

124.    Agent Leipfert knowingly and deliberately made material misrepresentations of fact that were essential to the appearance of probable cause in order to prosecute Mr. Guertin. Alternatively, Agent Leipfert made such misrepresentations with reckless disregard for their falsity.

125.    Agent Leipfert made material omissions with the deliberate intent to mislead magistrate judges and grand jurors into believing that there was probable cause to prosecute Mr. Guertin.

126.    Mr. Guertin suffered a deprivation of liberty as a result of Agent Leipfert's malicious prosecution of him.

127.    The charges against Mr. Guertin were ultimately terminated in his favor.

128.    Agent Leipfert's actions thus amounted to the tort of malicious prosecution under the law of the District of Columbia.

129.    Agent Leipfert's tort of malicious prosecution was also a knowing deprivation of Mr. Guertin's clearly established Fourth Amendment right to be free from malicious prosecution.

130.    Mr. Guertin exhausted his administrative remedies.

131.    Mr. Guertin's claimed damages are a direct and proximate result of the conduct set forth in support of this count.

132.    The United States is liable for Agent Leipfert's tortious conduct because a private employer would be liable for such conduct committed within the scope of employment.

## COUNT II
### FEDERAL TORT CLAIMS ACT
### (INVASION OF PRIVACY: INTRUSION UPON SECLUSION, PUBLIC DISCLOSURE OF PRIVATE FACTS, AND FALSE LIGHT)

133.    Mr. Guertin incorporates by reference all of the preceding paragraphs of this Complaint.

134.    Agent Leipfert is an employee of the United States.

135.    All of the actions taken by Agent Leipfert and referred to in the preceding paragraphs were within the scope of Agent Leipfert's employment.

136.    Agent Leipfert used investigation and examination to invade and interfere with Mr. Guertin's private and secret concerns—including but not limited to his emails, chat messages, and personal records—in a manner that would be highly offensive to an ordinary, reasonable person.

137.    Agent Leipfert's actions thus amounted to the invasion-of-privacy tort of intrusion upon seclusion under the law of the District of Columbia.

43

138.   Agent Leipfert, without waiver or privilege to do so, gave publicity to matters concerning the private life of Mr. Guertin by communicating to third parties—including, but not limited to, other federal employees, the grand jury, and the public—details about Mr. Guertin's personal finances and relationships, the disclosure of which would be highly offensive to a reasonable person and which was not of legitimate concern to the public.

139.   Agent Leipfert's actions thus amounted to the invasion-of-privacy tort of public disclosure of private facts under the law of the District of Columbia.

140.   Agent Leipfert publicized (that is, communicated to a third party), false statements, representations, and imputations that were understood to concern Mr. Guertin and which placed Mr. Guertin in a false light that would be offensive to a reasonable person. This included, but is not limited to, Agent Leipfert's perjured grand jury testimony.

141.   Agent Leipfert's actions thus amounted to the invasion-of-privacy tort of publicity that places a plaintiff in a false light under the law of the District of Columbia.

142.   Agent Leipfert's invasion-of-privacy torts were also knowing deprivations of Mr. Guertin's clearly established Fourth Amendment right to be free from unlawful search and seizure.

143.   Mr. Guertin exhausted his administrative remedies.

144.   Mr. Guertin's claimed damages are a direct and proximate result of the conduct set forth in support of this count.

145.   The United States is liable for Agent Leipfert's tortious conduct because a private employer would be liable for such conduct committed within the scope of employment.

## COUNT III
### FEDERAL TORT CLAIMS ACT
### (ABUSE OF PROCESS)

146.    Mr. Guertin incorporates by reference all of the preceding paragraphs of this Complaint.

147.    Agent Leipfert is an employee of the United States.

148.    All of the actions taken by Agent Leipfert and referred to in the preceding paragraphs were within the scope of Agent Leipfert's employment.

149.    Agent Leipfert utilized the search warrant process to compel the United States Magistrate Judges to issue search warrants that they could not legally and regularly have been required to issue had Agent Leipfert refrained from making material misrepresentations and omissions therein.

150.    Agent Leipfert utilized the grand jury processes to compel Mr. Guertin to defend himself against an indictment in a way that he could not legally and regularly be required to do had Agent Leipfert refrained from abusing the search warrant process and from giving perjured testimony to the grand jury.

151.    Agent Leipfert misused the search warrant and grand jury processes to further her own bad-faith pursuit of Mr. Guertin.

152.    Alternatively, Agent Leipfert misused the search warrant and grand jury processes by utilizing them without any genuine legal basis in order to obtain information that Agent Leipfert subjectively desired but could not lawfully obtain, or in order to carry out a failed attempt to compel Mr. Guertin to plead guilty to criminal charges that Agent Leipfert knew there was no probable cause to sustain.

153.    Agent Leipfert's actions thus amounted to the tort of abuse of process under the law of the District of Columbia.

154.   Mr. Guertin exhausted his administrative remedies.

155.   Mr. Guertin's claimed damages are a direct and proximate result of the conduct set forth in support of this count.

156.   The United States is liable for Agent Leipfert's tortious conduct because a private employer would be liable for such conduct committed within the scope of employment.

**COUNT IV**
**FEDERAL TORT CLAIMS ACT**
**(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)**

157.   Mr. Guertin incorporates by reference all of the preceding paragraphs of this Complaint.

158.   Agent Leipfert is an employee of the United States.

159.   All of the actions taken by Agent Leipfert and referred to in the preceding paragraphs were within the scope of Agent Leipfert's employment.

160.   All of the actions taken by Agent Leipfert and referred to in the preceding paragraphs amounted to extreme and outrageous conduct that intentionally or recklessly caused Mr. Guertin severe emotional distress.

161.   Agent Leipfert's actions were so outrageous in character and so extreme in degree that they surpassed all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community.

162.   Agent Leipfert's actions thus amounted to the tort of intentional infliction of emotional distress under the law of the District of Columbia.

163.   Mr. Guertin exhausted his administrative remedies.

164.   Mr. Guertin's claimed damages are a direct and proximate result of the conduct set forth in support of this count.

165.     The United States is liable for Agent Leipfert's tortious conduct because a private employer would be liable for such conduct committed within the scope of employment.

## COUNT V
## FEDERAL TORT CLAIMS ACT
## (NEGLIGENT SUPERVISION)

166.     Mr. Guertin incorporates by reference all of the preceding paragraphs of this Complaint.

167.     Agent Leipfert, Agent Yoder, Agent Baumgart, and other individuals whose job duties included supervising Agent Leipfert, are or were, at all relevant times, employees of the United States.

168.     All of the actions taken by Agent Leipfert and referred to in the preceding paragraphs were within the scope of Agent Leipfert's employment.

169.     All of the actions taken by Agent Yoder, Agent Baumgart, and other individuals whose job duties included supervising Agent Leipfert, and referred to in the preceding paragraphs were within the scope of those agents' employment.

170.     The United States and the State Department had a duty to supervise Agent Leipfert.

171.     The United States and the State Department knew or should have known that Agent Leipfert, in carrying out her investigation and prosecution of Mr. Guertin, behaved in an incompetent manner and thus required supervision.

172.     Agent Yoder, Agent Baumgart, and other individuals whose job duties included supervising Agent Leipfert had a duty to supervise Agent Leipfert.

173.     Agent Yoder, Agent Baumgart, and other individuals whose job duties included supervising Agent Leipfert knew or should have known that Agent Leipfert, in

carrying out her investigation and prosecution of Mr. Guertin, behaved in an incompetent manner and thus required supervision.

174.    The supervision provided by Agent Yoder, Agent Baumgart, and any other individuals whose job duties included supervising Agent Leipfert, was inadequate to satisfy any applicable duty to supervise Agent Leipfert.

175.    But for these agents' breach of the duty to supervise Agent Leipfert, Mr. Guertin would not have been prosecuted.

176.    The actions of the United States employees who actually did supervise or failed to supervise Agent Leipfert's investigation and prosecution of Mr. Guertin thus amounted to the tort of negligent supervision under the law of the District of Columbia.

177.    Mr. Guertin exhausted his administrative remedies.

178.    Mr. Guertin's claimed damages are a direct and proximate result of the conduct set forth in support of this count.

179.    The United States is liable for its employees negligent supervision of Agent Leipfert because a private employer would be liable for such conduct under the law of the District of Columbia.

## VI.    Prayer for Relief

Wherefore, based on the foregoing, Mr. Guertin respectfully requests that this Court enter a judgment in his favor and against the United States of America, to include the following relief: (a) compensatory damages, (b) attorney's fees; and (c) all damages authorized at law or equity, plus interest and costs.

**Date**: January 9, 2024                    Respectfully submitted,


                                             /s/   Kyle Singhal
                                             Kyle Singhal
                                             D.C. Bar No. 1601108 (*pro hac vice*)
                                             *Counsel for Plaintiff*
                                             Hopwood & Singhal, PLLC
                                             1701 Pennsylvania Ave., N.W., Ste. 200
                                             Washington, DC 20006
                                             (817) 212-9041
                                             kyle@hopwoodsinghal.com